**REDACTED**

IN THE ~~CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND~~UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ALAN WIEDERHOLD, | * | |
| 1706 Moonriver Ct | | |
| Forest Hill, Maryland 21050 | * | |
| | | |
|     Plaintiff, | * | |
| | | |
| v. | * | Case No. 1:25-cv-00801-ELH——— |
| | | |
| ASSUREDPARTNERS, INC., | * | |
| 450 S Orange Ave, 4th Floor | | |
| Orlando, Florida 32801 | * | |
| | | |
|     Serve on: | * | |
|     The Corporation Trust Incorporated | | |
|     2405 York Road, Suite 201 | * | |
|     Lutherville Timonium, MD 21093 | | |
| | * | |
| AP BENEFIT ADVISORS, LLC, | | |
| T/A EVOLUTION HEALTHCARE, | * | |
| 7 St. Paul Street, Suite 820 | | |
| Baltimore, Maryland 21202 | * | |
| | | |
|     Serve on: | * | |
|     The Corporation Trust Incorporated | | |
|     2405 York Road, Suite 201 | * | |
|     Lutherville Timonium, MD 21093 | | |
| | * | |
| ACCRETIVE HEALTHCARE, | | |
| SOLUTIONS, LLC, | * | |
| 450 S Orange Ave, 4th Floor | | |
| Orlando, Florida 32801 | * | |
| | | |
|     Serve on: | * | |
|     The Corporation Trust Incorporated | | |
|     2405 York Road, Suite 201 | * | |
|     Lutherville Timonium, MD 21093 | | |
| | * | |
| and | | |
| | * | |
| BRENNDAN MOHLER, | | |
| 2026 Skyline Road | * | |
| Towson, Maryland 21204 | | |

\*

\*

\* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>COMPLAINT</u>

COMES NOW, Plaintiff Alan Wiederhold ("Mr. Wiederhold), by and through

undersigned counsel, Charles S. Fax, Esq., Madelaine Katz, Esq. and Rifkin Weiner Livingston,

LLC, and for his claims and causes of action against Defendants for the wrongful discharge of

his employment and unlawful retaliation in violation of (i) the Employee Retirement Income

Security Act of 1974, as amended ("ERISA"); (ii) the Consolidated Appropriations Act of 2021

("CAA"), including but not limited to Sections 202 (the No Suprises Act) and 204

(Transparency); and (iii) the clear mandates of Maryland public policy, states as follows:

## <u>INTRODUCTION AND BACKGROUND</u>

~~1.~~ This wrongful termination and retaliation case arises out of Defendants' failure to

disclose pharmaceutical rebate compensation to their customers - employers who offer ERISA

group healthcare plans to their employees - known as Plan Sponsors. Mr. Wiederhold, who was

employed by Defendants as a Vice President overseeing Compliance, Operations and Client

Management at Evolution Healthcare, expressed to Defendants that it was their legal obligation

to disclose pharmaceutical rebates to their customers, and that their failure to do so – and their

intentional concealment of those rebates from Plan Sponsors – violated the law. Mr. Wiederhold

followed the law, advocated for compliance with the law, and refused to violate the law.

Defendants did not want to hear any more from Mr. Wiederhold, and did not want

Mr. Wiederhold to disclose any further compensation information as ERISA and the CAA

require. Thus, in retaliation for speaking up and exercising his legal rights, Defendants fired

Mr. Wiederhold.

***Pharmaceutical Rebates and the Prescription Drug Distribution Chain***

~~2.~~1.　　The prescription drug distribution chain includes the following: (a) the pharmaceutical drug manufacturer that develops and markets prescription drugs; (b) the pharmacy benefit manager ("PBM"), an intermediary between the health insurer and the pharmaceutical manufacturer, that negotiates rebates and discounts for the prescription drugs;[1] (c) the health insurer that provides insurance products to its insured, i.e., the Plan; (d) the pharmacy that dispenses the pharmaceutical drugs to the patients; and (e) the insured, the patients, that are the end user of a prescription drug.

~~3.~~　　A pharmaceutical rebate is a payment between the pharmaceutical manufacturer and the PBM, provided to the PBM when certain conditions are met, and passed along to the health insurer, the health insurance Plan. For example, if a certain amount of product is sold, the pharmaceutical manufacturer will pay an agreed upon amount of money, i.e., the rebate, to the PBM. The rebates have the effect of lowering the net price of the product. The rebate provided by pharmaceutical drug manufacturers to PBMs are passed down to health insurers to reduce the cost of certain prescription drugs to the end consumer, the insured, the patient.

~~4.　　The purpose of the rebates is to promote and offer low-cost or lower-cost prescription drugs to the public. When provided pharmaceutical rebate information, Plans have the purchasing power to drive the volume up for a specific drug, which in turn triggers the rebates, and allows the Plans to reduce the cost of its premiums or the prescription drugs~~

---

[1] PBMs are not at issue in this case, nor are there ~~There are three main PBMs, known as the "Big Three"_____ _____ which process approximately 80% of prescription drug claims in the United States, and negotiate prices with drug manufacturers and pharmacies.~~any allegations of wrongdoing asserted against any PBMs. The PBMs did exactly what they were required to do by contract and law when they provided pharmaceutical rebates to one or more of the Defendants to pass along to the Plan Sponsors.

~~included for the Plan participants / insured patients.~~ The rebates

~~5.~~2.    ~~The $557 billion dollar PBM industry states that its purpose is to help employers and other health care purchasers lower the cost of prescription drugs, resulting in more affordable healthcare for the American consumer. The industry points to pharmaceutical rebates as the driving force behind lowering such costs   rebates that~~ are also meant to trickle down to the insured (the Plan beneficiaries) through reduced premiums.

~~6.    The Pharmaceutical Care Management Association, the PBM's trade group, maintains that "PBMs are the only ones in the prescription drug supply chain whose focus is on bringing down cost."~~

~~*Our Government's Response and Policy to Support Realized Cost Savings from Rebates*~~

~~7.    The U.S. Government has recently begun enforcing the material cost savings representations made by the pharmaceutical manufacturers and PBMs in connection with pharmaceutical rebates.~~

~~8.    As the Federal Trade Commission points out, "PBMs have created and manage a system in which drug manufacturers compete for formulary placement by raising (not lowering) drug list prices so they can feed the higher rebates that PBMs demand. This perverse system results in billions of dollars in rebates and fees for the PBMs and their health plan sponsor clients   but does so at the expense of certain vulnerable … patients who must pay significantly more out-of-pocket for their critical medications."~~

~~9.    As the amount and volume of rebates go up, the pharmaceutical manufacturers increase the drug list price, eliminating any intended cost savings.~~

~~10.    Presidents Joe Biden and Donald Trump, amongst others, have pointed out that PBMs comprise a $557 billion dollar industry of "horrible middlemen" who become "rich as~~

hell" by driving up the cost of prescription drugs through "opaque" profit-driven pricing tactics.

11. It is common knowledge that employers and other healthcare payers also take issue with the PBMs' lack of transparency.

12. Hardworking individuals and families are overwhelmed by the everyday costs of living: food, fuel, housing, transportation, medical care, utilities, and insurance. In an effort to alleviate those burdens, laws have been enacted, including ERISA and the CAA, to help restore purchasing power to the American family and improve the American consumer's quality of life.

13. In 2020, Section 204 of the CAA, titled "Transparency" was enacted to protect consumers and promote transparency in healthcare costs, with a focus on prescription drug costs and a goal of reducing healthcare costs.

***Defendants' Lack of Transparency***

3. In 2020, Section 204 of the CAA, titled "Transparency" was enacted to protect consumers and promote transparency in healthcare costs, with a focus on prescription drug costs and a goal of reducing healthcare costs.

4. The~~The PBM's~~ lack of transparency that the CAA was enacted to address is being promoted ~~has now been extended~~ by Defendants, third-party administrators, in violation of federal law.

5. A third-party administrator ("TPA") is company that provides operational services such as claims processing and employee benefits management under contract to another company. TPAs are routinely seen in the insurance and healthcare industries.

~~14.~~6. Employer Plan Sponsors routinely hire third-party administrators to assist in managing and administering health benefits for their employees.

~~15.~~7. As third-party administrators, brokers and consultants, Defendants are the

5

middlemen between the PBMs and the healthcare Plan Sponsor clients.

~~16.~~8.  In that role, Defendants are ~~doubling down on the PBMs' actions to generate millions of dollars in revenues. Defendants are~~ pocketing the pharmaceutical rebates that were meant to lower the cost of premiums, instead of passing those rebates along to the Plan Sponsors<u>, to generate millions of dollars of revenue</u>.

~~17.~~9.  As a result, Defendants are intentionally not disclosing the existence of the rebates they receive each quarter from the PBMs based on each Plan Sponsor's spending; to disclose would prompt the Plan Sponsors' request for the rebates and require Defendants to relinquish those funds to the Plan Sponsors.

~~18.~~10.  Defendants' actions – of which Mr. Wiederhold and Defendants' customers are victims – increases the cost of healthcare for the American consumer. Thus, ~~like the PBMs,~~ Defendants, as brokers, consultants and third-party administrators, are the "horrible middlemen" who have focused on becoming "rich as hell" by driving up the cost of prescription drugs through "opaque as hell" profit-driven pricing tactics that violate the law. Ironically, Defendant Brenndan Mohler, an agent of the corporate Defendants, used these phrases routinely when referring to Defendants' retention and concealment of pharmaceutical rebates from the Plan Sponsors.

~~19.~~11.  Defendants' actions reveal that Defendants have rejected ERISA and the CAA and have intentionally acted contrary to what the law requires.

~~20.~~12.  Mr. Wiederhold has confronted Defendants about their violations of ERISA and the CAA, specifically, Defendants' refusal to share or disclose PBM rebates to their clients, an opaque profit-driven tactic.

~~21.~~13.  When Mr. Wiederhold raised Defendants' non-compliance, and advanced

concerns for Defendants' clients, as a fiduciary is obligated to do under ERISA and the CAA, Mr. Wiederhold was fired.

~~22.~~14.  Defendants fired Mr. Wiederhold because he: (i) spoke up about Defendants' failure to comply with the disclosure requirements of ERISA and the CAA; (ii) advocated for Defendants' compliance with the disclosure requirements of ERISA and the CAA; (iii) advocated for the good faith disclosure (and not concealment) of financial information that Plan Sponsors would need to make financial decisions and assess the reasonableness of Defendants' services; (iv) refused to violate ERISA and the CAA's disclosure requirements; (v) refused to violate his fiduciary obligations under ERISA and the CAA; (vi) provided information and testimony to clients, as is required under ERISA and the CAA; and (vii) complied with ERISA and the CAA.

~~23.~~15.  Accordingly, Mr. Wiederhold brings this action for damages and equitable relief for Defendants' retaliatory termination of his employment.

## PARTIES

~~24.~~16.  PLAINTIFF ALAN WIEDERHOLD is a Maryland resident. From 2019 through October 28, 2024, he was an employee and agent of Defendants AssuredPartners, Inc., AP Benefit Advisors, LLC t/a Evolution Healthcare, and Accretive Healthcare Solutions, LLC.

~~25.~~17.  DEFENDANT ASSUREDPARTNERS, INC. ("AssuredPartners") is a Delaware corporation with its principal place of business located at 450 S Orange Ave, 4th Floor, Orlando, Florida 32801.[2]

---

[2] AssuredPartners may also be doing business as The AssuredPartners Group.

26.18.  AssuredPartners is a full-service insurance broker and consulting firm, providing commercial insurance, risk management, employee benefits and third-party administrative services through the AssuredPartners umbrella of companies.

27.19.  Defendants AP Benefit Advisors, LLC t/a Evolution Healthcare and Accretive Healthcare Solutions, LLC are both divisions of AssuredPartners.

28.20.  DEFENDANT AP BENEFIT ADVISORS, LLC T/A EVOLUTION HEALTHCARE ("EVHC" or "AssuredPartners Employee Benefits Department") is a Maryland limited liability company with its principal place of business located at 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202.

29.21.  AssuredPartners acquired EVHC in September 2021, and refers to EVHC, a division of its business, as the AssuredPartners Employee Benefits Department.

30.22.  AssuredPartners, through EVHC, advertises that it provides customized health insurance plans to mid-size employers – giving them "everything they need to save on health insurance."

31.23.  On or about December 7, 2024, Non-Party Arthur J. Gallagher & Co. ("Gallagher") entered into a Stock Purchase Agreement to acquire AssuredPartners' stock and liabilities.[3]

32.24.  DEFENDANT ACCRETIVE HEALTHCARE SOLUTIONS, LLC ("Accretive") is a Delaware limited liability company with its principal place of business located at 450 S Orange Ave, 4th Floor, Orlando, Florida 32801.

33.25.  Accretive is a "nationwide collection of leading independent specialty and wholesale insurance providers and program administrators." Accretive "design[s] specialized

---

[3] When the sale is finalized, Plaintiff reserves the right to amend the names of the parties.

insurance and benefits solutions driven by new, creative ways to protect an organization and its people." It is "committed to forging strong, enduring partnerships ensuring that every client receives the protection and benefits they need to thrive."

34.26.  Accretive was formed in 2022 as an AssuredPartner. AssuredPartners' President and Accretive's CEO are the same, Sean Smith. AssuredPartners refers to Accretive as a division of its business.

35.27.  AssuredPartners, EVHC and Accretive are consultants, brokers and third-party administrators ("TPAs") that provide a variety of services to group health plans subject to ERISA, and to plan beneficiaries, and administer 100+ employer health benefits plans.

36.28.  EVHC and Accretive fall under the AssuredPartners brand and umbrella, and the three names – AssuredPartners, EVHC and Accretive – are routinely used interchangeably.

37.29.  DEFENDANT BRENNDAN MOHLER ("Mr. Mohler") resides at 2026 Skyline Road, Towson, Maryland 21204 and is a resident of Baltimore County, Maryland. Mr. Mohler is the Agency President of EVHC, the AssuredPartners Employee Benefits Department, and the Agency President of Accretive.

38.30.  As used herein, AssuredPartners, EVHC and Accretive will collectively be referred to as "AssuredPartners."

39.31.  At all times relevant herein, Mr. Mohler acted as an agent of AssuredPartners and/or in his individual capacity.

40.32.  Defendants transacted business throughout Maryland, including from their Maryland offices, located at 145 W Ostend Street, 2nd Floor, Baltimore, Maryland, 21230.

41.33.  Defendants are liable for the acts and omissions of their agents, servants and employees while acting within the course and scope of their employment.

**JURISDICTION AND VENUE**

42.34.  This Court has ~~federal question and supplemental jurisdiction over this matter and Defendants pursuant to 28 U.S.C. §§ 1131, 1367~~ jurisdiction over this matter and Defendants pursuant to Md. Code Ann. Cts. & Jud. Proc. §§ 6-102, 6-103. Defendants regularly transact business and perform work in Maryland. Mr. Mohler is domiciled and employed in Maryland.

43.35.  Venue is proper in this District pursuant to 28 U.S.C. 1391(b) because the acts complained of occurred within this District and Defendants reside or may be found in this District. ~~Court pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-201 because Defendants carry on regular business and/or are employed in the City of Baltimore, and the events relevant to the claims alleged herein occurred~~ in the City of Baltimore.

44.36.  Mr. Wiederhold has put Defendants on notice of his claims and exhausted all internal grievance procedures and available administrative processes prior to filing suit.

45.37.  A copy of this Amended Complaint will be served upon the Secretary of Labor and the Secretary of the Treasury by certified mail pursuant to 29 U.S.C. § 1132.

**FACTS**

46.38.  Plaintiff hereby incorporates by reference herein as if set forth in full the allegations in the preceding paragraphs.

47.39.  Mr. Wiederhold joined EVHC on September 1, 2019 as Head of Sales.

48.40.  On September 16, 2021, AssuredPartners acquired EVHC.

49.41.  Mr. Mohler became the President of EVHC following AssuredPartners' September 2021 acquisition of EVHC.

50.42.  In 2023, Mr. Wiederhold was promoted to Executive Vice President, where he oversaw Compliance, Operations and Client Management.

51.43.  The Consolidated Appropriations Act ("CAA"), which in part, amended and extended ERISA, was signed into law on December 27, 2020, and became effective December 27, 2021.

52.44.  AssuredPartners represents to the public that:

> AssuredPartners is a global front-runner in the insurance brokerage landscape, with special expertise in industry-specific insurance solutions for both businesses and consumers. We offer a comprehensive range of services, including commercial insurance, risk management, and employee benefits. As strategic advisors in the insurance domain, our unparalleled expertise empowers us to deliver tailor-made solutions designed to meet the unique needs of our clients. … Committed to building strong, long-lasting relationships, we foster an environment of trust, transparency, and mutual respect with our partners. This ethos is encapsulated in our guiding principle: Power through Partnership.

See https://www.assuredpartners.com/news-insights/press-releases/2024/assuredpartners-announces-strategic-leadership-appointment-to-drive-continued-growth-and-innovation/ (last visited January 22, 2025);

> AssuredPartners employee benefits department is comprised of a national team of dedicated, highly experienced insurance brokers and professionals who always have your best interests in mind and are passionate about protecting your assets and helping you grow. Our team approach combines local and national professionals to ensure you realize the maximum return on your healthcare investment.

See https://www.assuredpartners.com/employee-benefits/ (last visited January 22, 2025); and:

> Our experienced team of industry experts maintains an up-to-date knowledge of new laws and regulations, with areas of focus including, but not limited to, the following:
>
> - Consolidated Appropriations Act, including the No Surprises Act and other Transparency provisions
> - ERISA compliance, including notice and disclosure rules, best practices,
> - State law requirements

See https://www.assuredpartners.com/employee-benefits/health-welfare-compliance/#ACAReporting (last visited January 22, 2025).

53.45.  Relevant here, Defendants provide third-party administrative services to employers who are seeking to offer ERISA group health plans to employees.

54.46.  Defendants are engaged by these employers as their group health plans' third-party administrator; Defendants administer 100+ employer health benefit plans.

55.47.  Defendants work with these employers in selecting a single-employer group health plan, and provide access to a provider network and its discounted rates.

56.48.  At times, Defendants memorialize the scope of their agreement to provide services in an Administrative Services Agreement ("ASA"), pursuant to which Defendants agree to perform certain administrative services to their customers.

57.49.  Inherent in the contracts Defendants enter into with the Plan Sponsors are the duties of good faith and fair dealing.

58.50.  Defendants' customers, 100+ employers throughout the United States, are known as Plan Sponsors, within the meaning of ERISA and the CAA.

59.51.  The group health plans are covered plans within the meaning of ERISA and the CAA.

60.52.  TPAs are covered service providers, fiduciaries and parties in interest, as defined by ERISA and the CAA.

61.53.  Defendants are covered service providers, fiduciaries and parties in interest, as defined by ERISA and the CAA.

*ERISA and the CAA Disclosure Requirements*

62.54.  Section 408 of ERISA, 29 U.S.C. § 1108, requires that all contracts ERISA plans enter into must be reasonable, including contracts with service providers for third-party administrative services.

63.55.  Section 408 of ERISA, as amended by the CAA, effective December 27, 2021, 29 U.S.C. § 1108, requires covered service providers disclose specific information to ERISA Plan Sponsors.

64.56.  For a contract with a service provider under ERISA to be reasonable, the service provider must disclose all "direct compensation" and "indirect compensation" to "a responsible Plan fiduciary." 29 U.S.C. § 1108(b)(2).

65.57.  Direct and indirect compensation include commissions, service fees, contingent compensation such as bonuses and pharmaceutical rebates, transactional fees, and non-cash type compensation.

66.58.  The written disclosure of the direct and indirect compensation to the responsible Plan fiduciary must contain: a description of: (i) the compensation that will be or is expected to be received by the covered service provider; (ii) the services for which the compensation is or will be paid; (iii) the payer and recipient; and (iv) the arrangement between the payer and the covered service provider. 29 U.S.C. § 1108(b)(2)(B)(iii), (iv).

67.59.  The description of compensation must contain sufficient information to permit the Plan Sponsor to evaluate the reasonableness of the compensation or cost of the services. 29 U.S.C. § 1108.

68.60.  A responsible Plan fiduciary is a Plan fiduciary with authority to cause the Plan to enter into, extend, or renew a contract or arrangement of services for the Plan.  29 U.S.C. § 1108(b)(2)(B)(ii)(I)(ee).

69.61.  These disclosures must be made by the covered service provider to the responsible Plan fiduciary in advance of the date the service contract is entered into, extended or renewed. 29 U.S.C. § 1108(b)(2)(B)(v).

70.62.  Covered service providers under ERISA that must abide by these disclosure requirements, include (i) service providers providing brokerage and consulting services, (ii) that expect to receive $1,000 or more in compensation for their services. 29 U.S.C. § 1108(b)(2)(B)(ii)(I)(bb).

71.63.  Brokerage and consulting services are defined under ERISA and the CAA to include third party administration services, and the provision of services regarding the selection of insurance products, recordkeeping services, benefits administration, pharmacy benefit management service, the development or implementation of a plan, insurance product selection, and group purchasing organization agreements. 29 U.S.C. § 1108(b)(2)(B)(ii)(I)(bb)(AA), (BB).

72.64.  In other words, ERISA and the CAA require TPAs, including Defendants, to describe all direct and indirect compensation they receive or expect to receive related to the services they provide to each ERISA group health plan, including rebates.

73.65.  ERISA and the CAA require this disclosure to permit the Plan fiduciaries to determine whether the TPAs' services and fees are reasonable and necessary for the administration of the Plan; and permit the Plan fiduciaries to abide by their own legal requirements to disclose information to CMS through an RxDC Report.

https://www.cms.gov/marketplace/about/oversight/other-insurance-protections/prescription-drug-data-collection-rxdc.

74.66.  The covered service provider's failure to make these required ERISA and CAA disclosures means the covered service provider engaged in a prohibited transaction with the Plan.

75.67.  Engaging in prohibited transactions with Plans constitutes violations of ERISA and the CAA and subjects both the Plans and the covered service providers to penalties. 2911 U.S.C. §§ 1106, 1108.

76.68.  The duty to disclose compensation under ERISA and the CAA is on the covered service provider. See Section 408(b)(2) of ERISA, 2911 U.S.C. § 1108, and associated regulations, including but not limited to 29 C.F.R. § 2550.408b-2.

77.69.  Section 408(b)(2) of ERISA provides that (a) "A covered service provider **shall** disclose to a responsible plan fiduciary, in writing" … "all direct compensation" and "all indirect compensation" … to the responsible plan fiduciaries. 2911 U.S.C. § 11086(b)(2)(B)(iii), (iv) (emphasis added).

78.70.  Section 408(b)(2) of ERISA further provides that "A covered service provider **shall** disclose the information required under clauses (iii) and (iv) to the responsible plan fiduciary not later than the date that is reasonably in advance of the date on which the contract or arrangement is entered into, and extended or renewed." 1129 U.S.C. § 11068(b)(2)(B)(v) (emphasis added).

79.71.  A covered service provider cannot avoid its compensation disclosure requirements under ERISA and the CAA where a Plan fiduciary does not expressly ask for a compensation disclosure.

80.72.  A TPA's failure to disclose pharmaceutical rebate revenue compensation to group health plans does not constitute a good faith, reasonable interpretation of ERISA's disclosure requirements.

81.73.  A TPA's purposeful concealment of pharmaceutical rebate revenue compensation from Plan Sponsors does not constitute a good faith, reasonable interpretation of ERISA's disclosure requirements.

82.74.  A TPA's failure to disclose pharmaceutical rebate revenue compensation to group health plans breaches the TPA's contract for services with the Plan Sponsor.

### Fiduciary Duties under ERISA and the CAA

83.75.  ERISA and the CAA's transparency, disclosure and reporting requirements are also fiduciary duties imposed on TPAs, including Defendants.

84.76.  A TPA or other covered service provider is a fiduciary under ERISA and the CAA where: (i) it exercises discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of Plan assets; (ii) it renders investment advice for compensation with respect to any money or property of the Plan, or has any authority or responsibility to do so; or (iii) it has any discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. § 1002(21).

85.77.  ERISA prohibits a fiduciary of a Plan from acting in any transaction that is adverse to the interests of the Plan.

86.78.  ERISA prohibits a fiduciary of a Plan from receiving consideration for its own personal account in connection with a transaction involving the assets of the Plan.

87.79.  Fiduciaries' duties and responsibilities include the disclosure of specified information, acting in the best interest of the Plan and Plan beneficiaries, acting with full transparency, and avoiding of conflicts of interest.

88.80.  Defendants are fiduciaries of their customers' Plans under ERISA and the CAA because Defendants: (i) exercise discretionary authority and control regarding management of those Plans and the disposition of Plan assets; (ii) render investment advice for compensation with respect to Plan assets or has authority or responsibility to do so; and (iii) have discretionary authority and responsibility in the administration of the Plans.

89.81.  The purpose behind the Plan Sponsors' retention of Defendants is to afford Defendants with the discretionary authority and responsibility to administer the Plans.

90.82.  In connection with that retention, the Plan Sponsors delegate to Defendants the right to engage in certain acts on their behalf. Defendants are afforded the discretion to provide their services to the Plan Sponsors, and act on behalf of the Plan Sponsors, without being micro-managed.

91.83.  Pharmaceutical rebates are Plan assets.

92.84.  Defendants obtained the subject pharmaceutical rebates by negotiating a PBM contract with PBM ███████████.

93.85.  In accordance with that PBM contract, Tthe PBM pays out a quarterly rebate to Defendants for each Plan Sponsor based on the Plan Sponsor's spending on prescription drugs for that quarter. PBM ███████████ did exactly what it was supposed to do under the terms of its contract with Defendants.

94.86.  For example, if a Plan Sponsor spends a certain amount of money in Q1 2024, the PBM will calculate the rebate owed to that Plan Sponsor and distribute it to Defendants, as the third-party administrator and agent for the Plan Sponsor, during Q2 2024.

95.87.  Accordingly, Defendants obtained these pharmaceutical rebates at the expense of the Plans and Plan participants.

96.88.  Defendants exercise control over the Plans' assets, including but not limited to pharmaceutical rebates.

97.89.  Defendants are parties in interest under ERISA and the CAA because they provide services to the Plans.

98.90.  Parties in interest under ERISA and the CAA include fiduciaries of a Plan and any person providing services to a Plan, including non-fiduciaries. 29 U.S.C. § 1002(14).

99.91.  Parties in interest are prohibited from engaging in transactions that are likely to injure the Plan or its beneficiaries, such as transferring plan assets for the benefit of the party in interest, increasing the costs for Plan Sponsors, and concealing financial information that would permit Plan Sponsors to determine whether their services contracts are reasonable.

100.92.          Parties in interest who benefit from a prohibited transaction under ERISA can be held liable under ERISA.

***Defendants' Duty to Provide Plan Fiduciaries Requested Information***

101.93.          When a Plan fiduciary requests compensation disclosures or other relevant information from a TPA, the TPA is obligated to provide the Plan fiduciary with that information within 90 days of their request. 2911 U.S.C. § 11086(b)(2)(B)(viii).

94. If the TPA fails to provide the requested information, the Plan is required to notify the Secretary of Labor within 30 days, and is permitted to terminate its contract with the TPA for violating ERISA and the CAA. 2911 U.S.C. § 11086(b)(2)(B)(viii).

102. ***Retaliation Under ERISA***

95. Section 510 of ERISA, 29 U.S.C. § 1140 forbids a TPA from retaliating or taking adverse employment actions against its employees, including Mr. Wiederhold, because he has given information or has testified or is about to testify in any inquiry relating to ERISA or the CAA:.

It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter or the Welfare and Pension Plans Disclosure Act.

29 U.S.C § 1140.
103.

96. The termination of an employee because they gave information or have testified or are about to testify in any inquiry relating to ERISA or the CAA is unlawful retaliation. 29 U.S.C. § 1140.

97. This provision is known as the whistleblower provision of ERISA.

98. This provision is designed to encourage individuals with knowledge of potential ERISA violations to share information so that the potential violations can be raised and resolved.

99. Under 29 U.S.C. § 1140, Mr. Wiederhold was permitted to give information or testify in response to an inquiry.

100. Defendants violated 29 U.S.C. § 1140 when they terminated Mr. Wiederhold in response to his provision of information and testimony in response to an inquiry as follows: (i) Mr. Wiederhold directly demanding that his employer, Defendants, comply with the disclosure requirements set forth in 29 U.S.C. § 1108(b)(2)(B)(iii)(III) - (V) and (b)(2)(B)(v) to

disclose the existence of rebate compensation to the Plan Sponsors in advance of the Plan Sponsors' contract being entered into, extended or renewed; (ii) Mr. Wiederhold directly demanding that his employer, Defendants, comply with the disclosure requirements set forth in 29 U.S.C. § 1108(b)(2)(B)(iii)(III) - (V) and (b)(2)(B)(v) to disclose the amount of such rebate compensation - by either numerical value or formula - that Defendants were not sharing with or providing to the Plan Sponsors in advance of the Plan Sponsors' contract being entered into, extended or renewed; (iii) Mr. Wiederhold presenting the problem of Defendants' ERISA violations internally and externally so that Defendants could come into compliance with 29 U.S.C. § 1108(b)(2)(B)(iii) and (iv); (iv) Mr. Wiederhold making internal and external inquiries of Defendants for those violations, i.e., Defendants' failure and refusal to disclose all direct and indirect compensation to Plan Sponsors; and (v) Mr. Wiederhold providing information to Plan Sponsors as required by 29 U.S.C. § 1108(b)(2)(B)(iii) and (iv) in advance of the date on which the Plan Sponsors' contract or arrangement was entered into, extended or renewed, when Defendants would not.

101.    29 U.S.C. § 1108(b)(2)(B)(iii)(III) provides:

> A covered service provider shall disclose to a responsible plan fiduciary, in writing, the following: A description of all direct compensation, either in the aggregate or by service, that the covered service provider, an affiliate, or a subcontractor reasonably expects to receive in connection with the services described in subclause (I).

102.    29 U.S.C. § 1108(b)(2)(B)(iii)(IV) provides:

> A covered service provider shall disclose to a responsible plan fiduciary, in writing, the following: A description of all indirect compensation that the covered service provider, an affiliate, or a subcontractor reasonably expects to receive in connection with the services described in subclause (I)—including compensation from a vendor to a brokerage firm based on a structure of incentives not solely related to the contract with the covered plan; and A description of the arrangement between the payer and the

covered service provider, an affiliate, or a subcontractor, as applicable, pursuant to which such indirect compensation is paid.

103. 29 U.S.C. § 1108(b)(2)(B)(iii)(V) provides:

A covered service provider shall disclose to a responsible plan fiduciary, in writing, the following: A description of any compensation that will be paid among the covered service provider, an affiliate, or a subcontractor, in connection with the services described in subclause (I) if such compensation is set on a transaction basis (such as commissions, finder's fees, or other similar incentive compensation based on business placed or retained), including identification of the services for which such compensation will be paid and identification of the payers and recipients of such compensation (including the status of a payer or recipient as an affiliate or a subcontractor), regardless of whether such compensation also is disclosed pursuant to subclause (III) or (IV).

104. 29 U.S.C. § 1108(b)(2)(B)(v) provides:

A covered service provider shall disclose the information required under clauses (iii) and (iv) to the responsible plan fiduciary not later than the date that is reasonably in advance of the date on which the contract or arrangement is entered into, and extended or renewed.

105. Defendants violated 29 U.S.C. § 1108(b)(2)(B)(iii)(III), (IV), (V) and 29 U.S.C. § 1108(b)(2)(B)(v), whereas Mr. Wiederhold worked to comply with these provisions, and was fired as a result.

104.

***Defendants' Intentional Misrepresentations Regarding Compensation and Duty to Disclose***

105.106. Defendants affirmatively claim to their clients and internally amongst the Sales Team that all disclosures of compensation are provided to their clients through two (2) documents, the ASA and the BAA.

106.107. Neither the ASA nor the BAA disclose ***any*** pharmaceutical rebate compensation.

107.108.　　　Defendants intentionally refuse to disclose the material terms of their compensation by failing to send even the inadequate ASAs and BAAs to their customers.

108.109.　　　Defendants provide third-party administrative services to Plan Sponsors without first sending any contract or disclosures to the Plan Sponsor.

109.110.　　　Defendants have not sent any written compensation disclosures to approximately 54 of their clients, Plan Sponsors.

110.111.　　　Defendants did not send these Plan Sponsors any ASAs or BAAs prior to entering into an agreement for services.

111.112.　　　Since December 27, 2021, many Plan Sponsors who renewed or extended their contracts with Defendants did not receive any ASAs, BAAs or compensation disclosures, including: ██████████████████████████████████████████

████████████████████████████████████████.[4]

112.113.　　　Defendants wrongly contend that their BAA provides adequate ERISA and CAA disclosures.

113.114.　　　Defendants' BAA provides:

APBA dba Evolution Healthcare ("EVHC") **is disclosing all compensation** that it or any affiliates (as appropriate) reasonably expect to receive in connection with the services we may provide with respect to the ERISA-governed group health plan identified in the Proposal (the "Plan") and subject to the terms and conditions of the Proposal. …. **Other than as set forth below, we do not expect to be compensated** with respect to any services for the period specified in the Proposal. …

*EVHC's Direct and Indirect Compensation for EVHC's Services*

---

[4] ——Mr. Wiederhold anticipates Defendants will argue that a Restrictive Covenants Agreement from July 2021 mandates the names of the Plan Sponsors, clients, vendors and brokers be kept confidential. Accordingly, out of an abundance of caution, those names are redacted.

If EVHC is hired to perform the services specified above, during the period specified in the Proposal, EVHC reasonably expects to receive the following direct compensation from the Plan in connection with the following services which will be paid by the Plan Sponsor as invoiced [monthly]:

    a. Plan Sponsor will pay EVHC $_____ per employee per month for all services (unless otherwise noted below)

    b. In addition, in connection with the placement and management of the stoploss insurance selected by the Plan Sponsor, EVHC may also be paid an override by the stoploss carrier which can only be calculated at the end of the calendar year and that is contingent on several factors such as individual group enrollment, EVHC's entire block of business with the stoploss carrier, retention rates, and in some case overall block performance. Historically, these overrides (if any) paid to EVHC from the stoploss carrier have ranged between 0%and 5% of the premiums placed with the stoploss carrier.

    c. In addition, supplemental networks may pay EVHC a percentage of savings of all out-of-network claims up to 10% of the savings achieved.

(emphasis added).

114.115.    Defendants' BAA falsely states that they are disclosing "all compensation" and do not expect to be compensated in any way than through the three (3) forms of compensation enumerated in the BAA: (a) direct payment of TPA fees from Defendants' client, the Plan Sponsor; (b) kickbacks from stoploss insurance carriers; and (c) a potential payment for a percentage of all out-of-network claims from a supplemental network.

115.116.    Defendants intentionally omit from the BAA the rebate compensation they knew they would be receiving from PBMs, including ██████████.

116.117.    Despite Defendants entering into contracts with PBMs for the receipt of pharmaceutical rebates from 2019 through 2024, Defendants did not list any such compensation for the receipt of rebates in their BAA or ASA.

117.118.    Despite Defendants entering into contracts with PBMs for the receipt of pharmaceutical rebates on behalf of the Plan Sponsors from 2019 through 2024, Defendants

materially misrepresented to Plan Sponsors that Defendants would not be receiving any pharmaceutical rebates.

118.119.    Despite Defendants entering into contracts with PBMs for the receipt of pharmaceutical rebates on behalf of the Plan Sponsors from 2019 through 2024, Defendants intentionally withheld from the Plan Sponsors this indirect compensation.

119.120.    Defendants' BAAs misrepresent to Plan Sponsors that there are only 3 sources of compensation Defendants are receiving - and that pharmaceutical rebates are not one of them.

120.121.    Defendants claim that they enter into ASAs with their clients, and that those written agreements contain all necessary compensation disclosures not already contained within the BAAs.

121.122.    From 2019 through 2024, Defendants' representations to Plan Sponsors in any ASA or BAA have been false, as there are no disclosures of rebate compensation in either the ASA or BAA.

122.123.    Defendants have also informed Mr. Wiederhold that they are not required to disclose rebate compensation to Plan Sponsors, stating that such disclosure is not required by ERISA or the CAA.

123.124.    Defendants' representations to Mr. Wiederhold that they are not required to disclose rebate compensation to Plan Sponsors contradicts Defendants' legal obligations under ERISA and the CAA.

124.125.    Defendants' representations to Mr. Wiederhold that they are not required to provide any disclosures to Plan Sponsors other than what is contained in their ASA or BAA violates Defendants' legal obligations under ERISA and the CAA.

125.126.     Defendants' representations to Mr. Wiederhold that they are not obligated to make any compensation disclosures to Plan Sponsors because the obligation to learn of any such compensation falls on the Plan Sponsors are false.

126.127.     Since 2021, Defendants' in-house counsel Lauren Fischer, Esquire routinely agreed with Mr. Wiederhold that: (i) ERISA and the CAA required Defendants to provide additional disclosures to their Plan Sponsors; and (ii) those disclosures were required to include the pharmaceutical rebate compensation Defendants were receiving from PBMs.

127.128.     In October 2024, Mr. Mohler directed Defendants' in-house counsel Lauren Fischer, Esquire to stand down on drafting or circulating any ERISA and CAA disclosures.

128.129.     Mr. Mohler stated, "hell no," "there is no way in hell" that Defendants are voluntarily disclosing the existence of any pharmaceutical rebates to Plan Sponsors.

129.130.     Mr. Mohler terminated Attorney Fischer's authority to draft the ERISA and CAA disclosures she had been preparing for Defendants, and informed Mr. Wiederhold that Mr. Mohler was "taking over the project."

130.131.     Mr. Mohler stated that he would "personally control the disclosure process" to ensure that no other team members had oversight of how rebate data was disclosed.

131.132.     In rejecting Mr. Wiederhold's request that Plan Sponsors be provided disclosures under ERISA and the CAA regarding pharmaceutical rebates, Mr. Mohler stated "hell no" "we need to be opaque as hell."

132.133.     Defendants stated they needed to keep the pharmaceutical rebate revenue for two reasons: (i) to maintain and grow AssuredPartners's profitability; and (ii) to fund AssuredPartners' executive bonus pool.

133.134.    In 2024, the pharmaceutical rebate compensation that Defendants concealed from Plan Sponsors accounted for 61% of EVHC's total revenue.

134.135.    Since at least 2023, Defendants' growth strategy was based on increasing pharmaceutical rebate revenue.

135.136.    Despite recognizing in 2023 that their rebate-dependent growth strategy would not be sustainable, Defendants continued to focus on renewing contracts with the Plan Sponsors that generated the greatest pharmaceutical rebate revenue for AssuredPartners.

136.137.    David Wetzler, AssuredPartners Employee Benefits Division President, Sean Smith, CEO of Accretive and President of AssuredPartners, and Mr. Mohler, created the executive bonus pool with the intent that it would be funded by pharmaceutical rebate compensation.

137.138.    Mr. Mohler repeatedly stressed throughout 2023 and 2024 how it was imperative that the top 10 PBM revenue accounts be renewed, and that those Plan Sponsors never learn about any pharmaceutical rebates because EVHC's executive bonuses were at stake.

138.139.    Throughout 2023 and 2024, Mr. Mohler repeatedly instructed Mr. Wiederhold, as well as the entire Sales team at AssuredPartners, that they should never discuss pharmaceutical rebates with Plan Sponsors.

139.140.    Defendants' conversations about the funding of the bonus pool with undisclosed pharmaceutical rebates belonging to Plan Sponsors through 2023 and 2024 included communications and exchanges amongst: Mr. Mohler, David Wetzler, Lauren Fischer, Katie Sells, and Tom Nocar.

140.141.     Throughout 2023 and 2024, Mr. Mohler repeatedly stated that the top 10 PBM revenue account Plan Sponsors should never learn of the pharmaceutical rebates Defendants received.

141.142.     Throughout 2023 and 2024, Mr. Mohler repeatedly expressed that if the top 10 PBM revenue Plan Sponsors, including ██████████████████████████████ ████████████████████████████, learned about the pharmaceutical rebates, everyone would lose their bonuses.

142.143.     Defendants' conversations concerning renewal strategies for these top 10 PBM revenue Plan Sponsors, and how rebates must never be revealed, include communications and exchanges amongst: Mr. Mohler, Chris Baker, John Wolf, Tiffany Manik, Pam Saunders, Katie Sells, Tom Nocar, and Robert Painter.

143.144.     Mr. Mohler made it clear that if anyone spoke out about the undisclosed pharmaceutical rebates, they would lose their job.

144.145.     Katie Sells expressed that she was required to abide by Defendants' demands to maintain secret the pharmaceutical rebates, or that she would lose her job.

145.146.     Mr. Wetzler expressed at one point in time how the rebate process was "unethical and unsustainable."

146.147.     Defendants hid the pharmaceutical rebate information from Plan Sponsors, including but not limited to, ████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████.

147.148.     Defendants did not share the pharmaceutical rebates they received from PBMs with the Plan Sponsors, including but not limited to: ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████ .

148.149.    If a Plan Sponsor requested a copy of the contract Defendants maintained with a PBM, Defendants' sales team was instructed to inform the Plan Sponsor that the contract was a "proprietary contract" and that it could not be provided to the Plan Sponsor.

149.150.    Defendants' representations to Mr. Wiederhold that the obligation to learn of any compensation under ERISA and the CAA falls on Plan Sponsors demonstrates that Defendants purposefully withheld and continue to withhold the requisite ERISA and CAA compensation disclosures to Plan Sponsors.

150.151.    In or around November 2024 (after Mr. Wiederhold's employment was unlawfully terminated, as discussed below), Defendants entered into a PBM contract with ████████ .

151.152.    The PBM contract with ████████ provides approximately an additional $5 million dollars in pharmaceutical rebates for Defendants' Plan Sponsors. ████████ complied with its contractual obligations in providing those pharmaceutical rebates to Defendants, with the intent and understanding those rebates and cost savings would be passed along to Defendants' clients.

152.153.    Defendants have continued to conceal these pharmaceutical rebates and therefore have increased their revenues by $5 million dollars at the expense of their clients, the Plan Sponsors and Plan beneficiaries

153.154.　　If Defendants disclosed and passed along this additional $5 million dollars in rebates, the Plan Sponsors would receive those rebates and use them to offset the costs of health insurance premiums for their Plan participants, beneficiaries and members.

154.155.　　Defendants' violations of ERISA and the CAA also constitute breaches of contract and corresponding covenants of good faith and fair dealing inherent in those contracts with its customers, the Plan Sponsors.

***Mr. Wiederhold's Efforts to Obtain Compliance with ERISA and the CAA and Defendants' Refusal to Abide by the Law***

155.156.　　In or around February 2023, David Wetzler asked Mr. Wiederhold to look into the pharmaceutical rebates AssuredPartners was receiving and the corresponding revenue numbers.

156.157.　　Mr. Wiederhold discovered that AssuredPartners had retained approximately $27 million dollars in undisclosed PBM rebates that Defendants retained, and did not disclose or share with 129 Plan Sponsor.

157.158.　　At the AssuredPartners' Conference in August 2023, Mr. Wiederhold reported on the pharmaceutical rebates and how Defendants' profitability was based in large part on that rebate revenue.

158.159.　　AssuredPartners acknowledged that the pharmaceutical rebates were to be passed down to the Plan Sponsors to reduce plan premiums, and not to be kept by AssuredPartners.

159.160.　　AssuredPartners acknowledged at the Conference that focusing revenue growth on pharmaceutical rebates would not be sustainable, since there would ultimately be a ceiling on the pharmaceutical rebate revenue AssuredPartners could negotiate with the PBMs.

160.161.    AssuredPartners acknowledged at the Conference that they would look into the pharmaceutical rebate revenue and their use of allocating this revenue to fund executive bonus pools.

161.162.    Before, during and after the August 2023 AssuredPartners' Conference, Mr. Wiederhold reported to Defendants, through David Wetzler, Mr. Mohler and Lauren Fischer, Esquire, amongst others, that the pharmaceutical rebate revenue AssuredPartners was retaining needed to, at a minimum, be disclosed to Plan Sponsors in accordance with the compensation disclosure laws of ERISA and the CAA.

162.163.    In September 2023, at an EVHC strategy session, Mr. Mohler asked that an internal SWAT Team strategy for the top 10 pharmaceutical rebate revenue clients be initiated.

163.164.    Mr. Mohler said that he needed to ensure that those clients' contracts were being renewed for the upcoming year so that the rebate revenue would remain in place to maintain AssuredPartners' revenue numbers and to fund the executive bonus pools.

164.165.    In response, Mr. Wiederhold raised concerns to Mr. Mohler regarding the applicable law governing rebate and compensation disclosure requirements.

165.166.    Mr. Wiederhold also informed Mr. Mohler of the ethical issues raised by Defendants' actions of keeping pharmaceutical rebate revenue, which are Plan assets, without sharing the rebates or disclosing the existence of those rebates to the Plan Sponsors.

166.167.    In April 2024, during a company-wide meeting, Lauren Fischer, Esquire, EVHC in-house counsel, flagged Defendants' legal obligations to disclose pharmaceutical rebate revenues to the Plans, and created legal disclosures to provide to the Plans as they entered into

new contracts, or extended or renewed their contracts for third-party administrative services with Defendants.

167.168.	Mr. Mohler ignored Ms. Fischer's advice and instruction to disclose the pharmaceutical rebate revenues Defendants were receiving to the Plan Sponsors.

168.169.	Mr. Wiederhold raised his concerns again to AssuredPartners, citing AssuredPartners' own attorney, and the laws and regulations outlining Defendants' duties to its customers.

169.170.	Mr. Mohler instructed Mr. Wiederhold that there would be no disclosures, as they needed to be opaque as hell.

170.171.	When Plan Sponsor ████ inquired of Mr. Wiederhold as to the existence of PBM rebates, Mr. Wiederhold provided the requested information.

171.172.	When Plan Sponsor ████ informed Defendants it would not be renewing its Plan contract because it found a more cost-efficient third-party administrator where the Plan would receive the PBM rebate revenue (instead of the TPA) to offset premiums, Mr. Mohler screamed at Mr. Wiederhold for losing the ████ contract. Mr. Mohler complained that Mr. Wiederhold had jeopardized $1.7 million dollars in PBM rebate revenues and that it would impact the executive bonus pool.

172.173.	Despite Mr. Mohler's instructions, which violated ERISA and the CAA, Mr. Wiederhold disclosed the existence of PBM rebate revenues to Plan Sponsor ████ as an incentive to renew its contract for the following year.  Specifically, Mr. Wiederhold offered Plan Sponsor ████ a percentage of the pharmaceutical rebates Defendants were retaining. ████ was unhappy when it learned that there were rebates, that Defendants had failed to

disclose this financial information despite its duty to do so, and that Defendants refused to provide 100% of the past and future rebate revenue to ███████'s Plan.

173.174.    Defendants refused to provide Plan Sponsor ███████ the pharmaceutical rebates they were receiving and, therefore, ███████ terminated its contract with Defendants.

174.175.    Mr. Wiederhold also disclosed the existence of the pharmaceutical rebates to Plan Sponsor ███████ when its broker Sarah Napoli requested the information.

175.176.    On October 21, 2024, during a group meeting attended by Mr. Mohler, Mr. Wiederhold, Ms. Fischer, Katie Sells, and Pam Saunders, Ms. Fischer circulated three proposed versions of the CAA disclosures that would be sent to every Plan Sponsor, listing estimated pharmaceutical rebates. On a 2 pm Teams Videoconference call that day, Mr. Mohler stated: "I am not sending this out like this." "I am going to be opaque as hell and I am going to take the project over."

176.177.    Ms. Fischer and Mr. Wiederhold stressed that these CAA disclosures needed to be sent out to every Plan Sponsor before the renewals came in, i.e., prior to November 1, 2024 (despite the fact that Defendants failed to send out any disclosures in 2021, 2022 or 2023). Ms. Fischer stated that Defendants' failure to do so under ERISA and the CAA could result in "possible legal exposure."

177.178.    During this meeting, Mr. Wiederhold circulated a copy of the National Association of Health Underwriters ("NAHU") PowerPoint with proposed CAA disclosures in the Teams Chat-box, explaining that "according to the CAA, the law requires disclosures be sent out" to Plan Sponsors.

178.179.     Ms. Fischer agreed with Mr. Wiederhold's statement and confirmed again, "this is a CAA requirement" and "we need to send this out to every [Plan Sponsor] with every change/every proposal" to our contracts. Mr. Mohler responded forcefully, "Hell no."

179.180.     On or about October 21, 2024, Plan Sponsor ██████'s broker/agent, ██████ of ████ asked Mr. Wiederhold about the current PBM rebate contracts and terms, seeking to understand ████'s rebate entitlements and asking for documentation of same.

180.181.     In an effort to comply with the reporting requirements under ERISA and the CAA, Mr. Wiederhold provided Plan Sponsor ██████'s broker/agent ████ the requested information verbally, but was unable to provide ████ any written disclosures, as none existed.

181.182.     On October 22, 2024, in response to the renewal conversations with certain Plan Sponsors' broker ████, Mr. Wiederhold discussed rebate entitlements with Defendants, suggesting again that Defendants offer Plan Sponsors a conditional rebate return as an incentive to renew their contract. By doing so, full disclosure concerning the pharmaceutical rebates and all direct and indirect compensation as required by law would be provided to the Plan Sponsors.

182.183.     Mr. Mohler instructed Mr. Wiederhold to stand down and that he was not authorized to offer any rebate incentives for Plan Sponsors to renew their contracts – he would have to find another way to ensure that the top 10 PBM revenue Plan Sponsors renew their contracts.

183.184.     In fact, from June through October 2024, Mr. Mohler tasked Mr. Wiederhold with soliciting Plan renewals. Mr. Wiederhold was the Operations in charge of

managing, training and mentoring the Senior Consultant manager and their direct reports whose job it was to solicit the renewals.

184.185.    Mr. Mohler asked Mr. Wiederhold to request that each Plan Sponsor review and sign a BAA which contained misrepresentations: namely that there were only three sources of compensation Defendants would be receiving in exchange for their provision of third-party administrative services to the Plan Sponsor, and that rebates were not one of them.

185.186.    When Plan Sponsors requested PBM contract details and rebate information, Mr. Mohler directed that the information not be provided, in violation of ERISA.

186.187.    Mr. Mohler also told Mr. Wiederhold that if a Plan Sponsor asked too many questions about compensation or rebates, they should be "redirected" to another topic of inquiry. If that did not work, the conversation needed to end, and the Plan Sponsor needed to be referred directly to Mr. Mohler.

187.188.    Mr. Wiederhold's advocation of ERISA and CAA disclosures during the October 21, 2024 team meeting was the last straw for Defendants.

188.189.    Defendants terminated Mr. Wiederhold's employment on October 28, 2024.

189.190.    Upon information and belief, others have been discharged or forced to quit for the same reasons.

190.191.    One employee was recently forced to resign when Defendants refused to allow him to disclose or share Defendants' pharmaceutical rebate compensation with two Plan Sponsors, ██████ and ██████████.

191.192.    Another employee was forced to resign after he raised concerns regarding Defendants' lack of transparency and failure to disclose rebates under ERISA and the CAA.

*Defendants' Violations of ERISA and the CAA*

~~192.~~193.　　Defendants violated ERISA and the CAA by:

a.　　Failing to disclose indirect compensation to Plan Sponsors;

b.　　Intentionally concealing at least $27 million dollars in pharmaceutical rebates (indirect compensation) to Plan Sponsors;

c.　　Failing to act in the best interests of Plan Sponsors;

d.　　Engaging in prohibited transactions, including but not limited to the provision of unreasonable services to Plan Sponsors;

e.　　Engaging in self-dealing by engaging in transactions that financially benefitted Defendants at the expense of the Plan Sponsors;

f.　　Engaging in self-dealing by diverting for their own use monies that were owed to the Plans;

g.　　Failing to disclose to Plan Sponsors critical financial information that impaired the Plan Sponsors' fiduciary duties to their beneficiaries;

h.　　Terminating Mr. Wiederhold's employment when he: advocated that Defendants follow the law; refused to violate ERISA and the CAA; followed the law; and provided information and testimony in response to an inquiry under ERISA and the CAA.

*Mr. Wiederhold's Refusal to Violate ERISA and the CAA*

~~193.~~194.　　Mr. Wiederhold refused to withhold rebate compensation information from Plan Sponsors who inquired of Mr. Wiederhold about the existence of any pharmaceutical rebates.

195.    When Mr. Wiederhold was asked by Plan Sponsors about the existence of any pharmaceutical rebates, Mr. Wiederhold disclosed such compensation as is required under ERISA and the CAA.

~~194.~~196.    When Mr. Wiederhold received an inquiry for information under ERISA, Mr. Wiederhold disclosed such information as would be required in any ERISA-related inquiry or proceeding, and in accordance with 29 U.S.C. § 1108(b)(2)(B)(iii) and (v).

***Mr. Wiederhold's Provision of Information and Testimony in Response to Plan Sponsor Inquiries Requested under ERISA and the CAA***

~~195.~~197.    Throughout September and October 2024, Defendants' customers, Plan Sponsors, inquired of Mr. Wiederhold for Defendants' PBM contract details and pharmaceutical rebate information.

~~196.~~198.    Mr. Wiederhold provided the rebate revenue and compensation information to those Plan Sponsors and brokers who requested the compensation disclosure information, as was required by ERISA and the CAA.

~~197.~~199.    One Plan Sponsor, ████, inquired of Mr. Wiederhold as to what was the direct and indirect compensation structure for the AssuredPartners' contract renewals.

~~198.~~200.    Mr. Wiederhold informed Plan Sponsor ████, as he was legally obligated to do under ERISA and the CAA, of (i) AssuredPartners' contract with PBM ████ for pharmaceutical rebates; and (ii) how EVHC was retaining those PBM rebates, a source of EVHC's known, indirect compensation.

~~199.~~201.    Plan Sponsor ████ and its agents and principals were unhappy with this newly disclosed (and previously withheld) knowledge.

~~200.~~202.    During Defendants' renewal process for its customer and Plan Sponsor ████, the Plan Sponsor's broker, ████, inquired of Mr. Wiederhold what compensation

36

incentives were available to foster the Plan Sponsor's renewal of its contract with Defendants for an additional year.

201.203.    As an incentive for renewal, Mr. Wiederhold offered the Plan Sponsor a percentage of the pharmaceutical rebates Defendants were currently retaining.

202.204.    It turned out that Plan Sponsor ███████ was also unaware that there were rebates, that Defendants were retaining the rebates, that Defendants had failed to disclose this indirect compensation information to Plan Sponsor ███████ despite its duty to do so, and that AssuredPartners refused to provide 100% of the past and future rebate revenue to Plan Sponsor ███████'s Plans.

203.205.    Plan Sponsor ███████ requested the rebate revenue Defendants had been retaining. Defendants refused to provide this once-undisclosed compensation back to Plan Sponsor ███████, resulting in the loss of ███████'s contract.

204.206.    Plan Sponsor ███████, by its broker, ███████, also inquired of Mr. Wiederhold as to the existence of any pharmaceutical rebates.

205.207.    Mr. Wiederhold provided Plan Sponsor ███████ the requested information.

***Additional Facts Demonstrating Defendants' Willful Intention to Violate the Law***

206.208.    In 2019 Mr. Wiederhold authored a book titled, "Cheated: How Healthcare Stole the American Dream and Only You Can Take It Back." Mr. Wiederhold's book discusses the history of healthcare in the United States, the rising cost of pharmaceuticals, the negotiated pharmaceutical rebates and how third-party administrators were keeping the rebates instead of turning them over to the Plans, amongst other related topics.

207.209.    Prior to finalizing and publishing this book, Mr. Wiederhold gave EVHC and its partners a pre-publication copy to review.

208.210.    EVHC, by and through Todd Sullivan, amongst others, expressly told Mr. Wiederhold that he needed to remove any chapter or discussion about pharmaceutical rebates, including the content concerning the retention of rebates in breach of a TPA's fiduciary duties to the Plans' beneficiaries, and the recommended disclosure of those rebates to Plans.

209.211.    To explain revenues, Defendants have advised Mr. Wiederhold that they categorize the pharmaceutical rebates as a "large 1 year gift" each year for accounting purposes.

***Public Policies Violated by Plaintiff's Termination***

210.212.    Maryland recognizes a public policy against retaliatory termination of employees.

211.213.    Maryland recognizes a public policy of protecting the rights of whistle blowers, and to ensure that persons are not prevented from blowing the whistle or exercising their legal rights to be a whistle blower.

212.214.    Maryland recognizes a public policy against terminating employees of covered service providers under ERISA who provide ERISA and CAA disclosures to Plan Sponsors.

213.215.    Maryland recognizes a public policy against terminating employees who refuse to engage in illegal acts.

214.216.    Maryland recognizes a public policy against terminating employees who opt to follow the law despite a direction from their employer that the law be violated.

215.217.    Maryland recognizes a public policy against terminating employees who advocate that their employers abide by the law, including but not limited to advocating that their employers abide by ERISA and the CAA's compensation disclosure requirements.

216.218.    Maryland recognizes a public policy against terminating employees who speak up about their employer's violations of the law, whether those communications are made internally and directly to the employer, or externally to the public.

217.219.    Maryland recognizes a public policy that persons operating and doing business within the State abide by both federal and state law.

218.220.    Maryland recognizes a public policy that ERISA-governed plans must be safeguarded and not mismanaged.

219.221.    Maryland recognizes a public policy that encourages transparency and ethical corporate governance.

220.222.    Maryland recognizes a public policy that employees should not be fearful of losing their employment if they answer their customers' questions truthfully.

***Damages***

221.223.    As a result of Defendants' willful, retaliatory and wrongful discharge of Mr. Wiederhold, Mr. Wiederhold has incurred, and will continue to incur, monetary damages from the loss of his employment, including but not limited to, unpaid salary, unpaid commissions, unpaid bonus, lost employment benefits, and attorneys' fees and costs.

222.224.    As a result of Defendants' willful, retaliatory and wrongful discharge of Mr. Wiederhold, Mr. Wiederhold has and will continue to suffer other harm, including but not limited to, emotional distress, mental anguish, and pain and suffering.

<u>**COUNT I**</u>
**Wrongful Discharge and Retaliation**

223.225.    Plaintiff hereby incorporates by reference herein as if set forth in full the allegations in the preceding paragraphs.

224.226.    Maryland recognizes a cause of action for wrongful discharge when the motivation for the discharge contravenes a clear mandate of public policy.

225.227.    Beginning in 2019, Mr. Wiederhold was employed by Defendants in Maryland.

226.228.    On October 28, 2024 Mr. Wiederhold was discharged from his employment.

227.229.    There exists a clear causal nexus between Mr. Wiederhold's conduct, and Defendants' decision to discharge Mr. Wiederhold.

228.230.    Mr. Wiederhold was terminated and discharged from his employment because:

a.    He refused to be complicit in Defendants' continued violations of ERISA and the CAA;

b.    He raised concerns that Defendants were not in compliance with their compensation disclosure obligations as covered service providers and fiduciaries to Defendants' customers, Plan Sponsors under ERISA and the CAA;

c.    He demanded that Defendants comply with ERISA and the CAA by providing the requisite compensation disclosures to Defendants' customers, Plan Sponsors;

d.    He refused to engage in unlawful conduct as was directed by Defendants, including but not limited to, withholding compensation disclosures from Defendants' customers Plan Sponsors, and refusing to provide compensation disclosures to

Defendants' customers Plan Sponsors when inquired into and requested;

    e.      He refused to breach the fiduciary duties Defendants and their agents owed to the Plan Sponsors, in violation of ERISA and the CAA;

    f.      He affirmatively performed legal duties – and exercised his legal rights – as is required by ERISA and the CAA in providing compensation disclosures to Defendants' customers Plan Sponsors when inquired into and requested;

    g.      He reported Defendants' illegal behaviors to the Plan Sponsors in response to their inquiries and request for information and testimony; and

    h.      He reported compensation disclosures to third-parties, as is required under ERISA and the CAA.

~~229.~~231.    Mr. Wiederhold's actions constitute protected activity under ERISA and the CAA.

~~230.~~232.    Mr. Wiederhold was wrongfully discharged in violation of the following clear mandates of public policy Maryland recognizes:

    a.      against retaliatory termination of employees;

    b.      protecting the rights of whistle blowers, and to ensure that persons are not prevented from blowing the whistle or exercising their legal rights to be a whistle blower;

    c.      against terminating employees of covered service providers under ERISA who provide ERISA and CAA disclosures to Plan Sponsors;

    d.      against terminating employees who refuse to engage in illegal acts;

    e.      against terminating employees who opt to follow the law despite a direction from their employer that the law be violated;

f.     against terminating employees who advocate that their employers abide by the law, including but not limited to advocating that their employers abide by ERISA and the CAA's compensation disclosure requirements;

g.     against terminating employees who speak up about their employer's violations of the law, whether those communications are made internally and directly to the employer, or externally to the public;

h.     that persons operating and doing business within the State abide by both federal and state law;

i.     that ERISA-governed plans must be safeguarded and not mismanaged;

j.     that encourages transparency and ethical corporate governance; and

k.     that employees should not be fearful of losing their employment if they answer their customers' questions truthfully.

~~231.~~233.     Defendants' motivation for discharging Mr. Wiederhold was to increase revenues, fund executive bonus pools, and prevent Mr. Wiederhold from providing any further ERISA and CAA disclosures of pharmaceutical rebate compensation to Plan Sponsors.

~~232.~~234.     Defendants terminated Mr. Wiederhold to avoid distributing monies they received from the PBMs from 2021 through 2024 to the Plan Sponsors.

~~233.~~235.     Defendants terminated Mr. Wiederhold to profit from the monies they received from the PBMs since 2021 that were allocated for others, the Plan Sponsors.

~~234.~~236.     Defendants terminated Mr. Wiederhold to avoid having to explain to their clients why they were holding onto the pharmaceutical rebates that were allocated for those clients since 2021, and had not been distributed.

~~235.~~237.     Defendants' motivations for their discharge of Mr. Wiederhold violate the

above listed public policies.

236.238.    A clear nexus exists between Mr. Wiederhold's conduct and Defendants' decision to terminate him.

237.239.    As a result of Defendants' wrongful and retaliatory discharge, Mr. Wiederhold has been harmed.

238.240.    Defendants and their agents acted with actual malice and willful disregard to Mr. Wiederhold's protected rights.

239.241.    At all times relevant hereto, Defendants acted with an evil motive and intent, to frustrate and demoralize law-abiding employees who read up on their legal duties, their employer's legal duties, and their clients' and customers' rights.

240.242.    Defendants were well aware of ERISA and the CAA and consciously elected to disregard the law, including but not limited to those statutory disclosure requirements and fiduciary obligations imposed on Defendants.

241.243.    A wrongful discharge claim is an appropriate means for enforcing the clear mandates of Maryland's public policy.

242.244.    A wrongful discharge claim is an appropriate means for enforcing the policies of ERISA and the CAA.

243.245.    Mr. Wiederhold reported violations of ERISA and the CAA to Defendants, and to others when inquired, in good faith as follows:

a.    Defendants made false statements of material fact to the Plans concerning their compensation, with the intention to mislead the Plans into believing they had been provided a complete compensation disclosure statement;

b.    Defendants failed to provide written disclosure of *any* compensation (not

43

just the rebates) to the Plans, completely disregarding ERISA and the CAA's requirements.

        c.      Defendants failed to disclose the existence of any pharmaceutical rebates to the Plans; and

        d.      Defendants kept Plan assets by failing to distribute the pharmaceutical rebates to Plan Sponsors, including but not limited to the lagged pharmaceutical rebates that were sent to Defendants after a Plan Sponsor terminated its contract with Defendants.

~~244.~~246.     In response to Mr. Wiederhold's notices and representations to Defendants, and Defendants' clients, and Mr. Wiederhold's refusal to violate the law, Defendants terminated Mr. Wiederhold's employment.

~~245.~~247.     Mr. Wiederhold was terminated because:

    a.  He inquired into Defendants' compliance with ERISA and the CAA;

    b.  He insisted that Defendants comply with ERISA and the CAA;

    c.  He disclosed to Plan Sponsors the compensation Defendants received in connection with their Plans, as required by ERISA and the CAA;

    d.  He refused to conceal from the Plan Sponsors the pharmaceutical rebate compensation Defendants received on their behalf;

    e.  He refused to provide false information to the Plan Sponsors or their brokers, including Plan Sponsors ██████████, ██████ and ██████, who inquired into whether Defendants were receiving and not disclosing rebate compensation to the Plans as required by ERISA and the CAA; and

    f.  He refused to violate the law.

246.248.    As a direct and proximate cause of Defendants' intentional conduct and termination of Mr. Wiederhold, Mr. Wiederhold has suffered and will continue to suffer millions of dollars of damages attributable to his loss of employment, loss of income, loss of professional opportunities, emotional distress, humiliation, pain, suffering, inconvenience, mental anguish, and personal and professional embarrassment.

247.249.    As a direct and proximate cause of Defendants' intentional conduct in violation of state and federal law, Mr. Wiederhold is entitled to punitive damages.

248.250.    Accordingly, Mr. Wiederhold requests the reinstatement of his employment, lost wages, lost benefits, front pay, compensatory damages for emotional distress and mental anguish, punitive damages, reasonable attorneys' fees and costs incurred in connection with this lawsuit, and pre- and post-judgment interest.

## COUNT II
### Retaliation in Violation of ERISA

249.251.    Plaintiff hereby incorporates by reference herein as if set forth in full the allegations in the preceding paragraphs.

250.252.    ERISA's anti-retaliation provision, Section 510, 29 U.S.C. § 1140, makes it unlawful for Defendants to discharge or retaliate against "any person," including Mr. Wiederhold, "because he has given information or has testified or is about to testify in any inquiry" relating to ERISA.

251.253.    Protesting a legal violation in connection with an ERISA-governed plan and raising the problem to the Plan Sponsor constitutes ERISA-protected activity.

252.254.    Throughout September and October 2024, Defendants' customers, Plan Sponsors, contacted Mr. Wiederhold and inquired of Mr. Wiederhold about Defendants' PBM contract details and pharmaceutical rebate information applicable to the Plans.

253.255.     The Plan Sponsors specifically inquired into Defendants' indirect compensation through rebate revenue that are assets of the Plans.

254.256.     In response, Mr. Wiederhold provided the Plan Sponsors the legally required compensation disclosure information that was requested, and that was required to be disclosed in accordance with 29 U.S.C. § 1108(b)(2)(B)(iii) and (v), in advance of the date on which the Plan Sponsor's contract or arrangement with Defendants was entered into, extended or renewed.

255.257.     Mr. Wiederhold provided the rebate revenue and compensation information to those Plan Sponsors and brokers who requested the compensation disclosure information, as was required by ERISA and the CAA.

256.258.     ERISA and the CAA required Mr. Wiederhold and Defendants to provide this material information to the Plan Sponsors, both before the information was provided, and in response to their inquiries for such material information concerning compensation.

257.259.     The Plan Sponsors who received this previously undisclosed compensation information either terminated their contracts with Defendants or declined to renew their existing contracts.

258.260.     In providing the requested information to Plan Sponsors under ERISA and the CAA in September and October 2024, Mr. Wiederhold engaged in protected activity under ERISA's anti-retaliation provision, 29 U.S.C. § 1140.

259.261.     In providing this information and testimony to these external Plan Sponsors, Mr. Wiederhold presented the problems of Defendants' violations of ERISA to the responsible managers of the ERISA Plans, the Plan Sponsors and/or their fiduciary agents, in anticipation of any ERISA-related inquiry or proceeding.

260.262.     In response to providing this information and testimony to the Plan Sponsors, and protesting Defendants' legal violations in connection with an ERISA Plan, Mr. Wiederhold suffered an adverse employment action: Defendants terminated Mr. Wiederhold's employment.

263.   Defendants' termination of Mr. Wiederhold's employment constitutes unlawful retaliation by Defendants under ERISA and the CAA.

264.   Mr. Wiederhold is a fiduciary and therefore has standing to pursue an unlawful retaliation claim under ERISA and the CAA.

265.   Defendants are fiduciaries to the Plans in their capacities as third-party administrators, and Mr. Wiederhold is a fiduciary because he was an agent of Defendants.

261.

262.266.     Defendants specifically intended that their customers, the Plan Sponsors, not learn about the pharmaceutical rebates or the compensation of PBM rebate revenue Defendants were receiving as an agent and fiduciary of the Plans, but instead intentionally retained as "rebate revenue."

263.267.     Defendants expressly told Mr. Wiederhold to never speak about the rebates or rebate revenue to the Plan Sponsors, in an attempt to further its scheme of withholding compensation information from the Plan Sponsors.

264.268.     When Defendants learned that Mr. Wiederhold disclosed rebate compensation information to certain Plan Sponsors in October 2024, as is required by ERISA and the CAA, Defendants yelled at and berated Mr. Wiederhold.

265.269.     As a direct and proximate result of Mr. Wiederhold's provision of ERISA and CAA compensation disclosures to Defendants' customers, the Plan Sponsors, Defendants

informed Mr. Wiederhold that his employment was terminated.

~~266.~~270.     In other words, Mr. Wiederhold blew the whistle on Defendants' failure to provide adequate compensation disclosures of all indirect compensation, as is required under ERISA and the CAA, and, as a result, his employment was terminated.

~~267.~~271.     Defendants had no other motive than a retaliatory motive when they discharged and terminated Mr. Wiederhold's employment.

~~268.~~272.     No productivity or performance issues had ever been discussed with Mr. Wiederhold during his employment.

~~269.~~273.     Defendants did not have any plans to discharge Mr. Wiederhold from his employment prior to October 2024.

~~270.~~274.     Only after Mr. Wiederhold continued to raise concerns about Defendants' continued and intentional violations of ERISA and the CAA, and then subsequently provided compensation disclosures to Defendants' customers, Plan Sponsors, contrary to Defendants' position that such compensation information not be revealed, was Mr. Wiederhold terminated.

~~271.~~275.     Defendants' actions in retaliating against Mr. Wiederhold constitutes a violation of Section 510 of ERISA. 29 U.S.C. § 1140.

~~272.~~276.     As a direct and proximate result of Defendants' unlawful actions, Mr. Wiederhold has suffered and will suffer millions of dollars of damages, including but not limited to loss of employment, loss of income, mental anguish, emotional distress, pain and suffering and attorneys' fees and costs.

WHEREFORE, for the foregoing reasons, Plaintiff Alan Wiederhold demands judgment against Defendants, jointly and severally, and that this Honorable Court enter an Order:

A.  Reinstating Mr. Wiederhold to his former employment position(s) with Defendants;

B.  Awarding Mr. Wiederhold full back pay and benefits Mr. Wiederhold would have received but for Defendants' violations, in an amount to be determined at trial;

C.  Awarding Mr. Wiederhold compensatory damages for emotional distress, mental anguish and pain and suffering incurred by Mr. Wiederhold as a result of Defendants' unlawful conduct in an amount that exceeds $75,000.00, plus reasonable attorneys' fees, costs, pre-judgment and post-judgment interest;

D.  Awarding Mr. Wiederhold punitive damages and all other equitable relief and statutory damages recoverable under ERISA and the CAA in an amount that exceeds $75,000.00; and

E.  Granting such other or further relief as this Honorable Court deems necessary and proper.

## JURY DEMAND

Plaintiff Alan Wiederhold hereby demands a trial by jury as to all issues raised in the Amended Complaint filed in this matter that are jury triable under pertinent law.

Dated: ~~February 4~~March 14, 2025     Respectfully submitted,

**ALAN WIEDERHOLD**
By Counsel


_____/s/ Madelaine Katz_____
Charles S. Fax, Esq.~~.~~, Bar No. 02490 ~~(CPF #9006040006)~~
Madelaine Kramer Katz, Esq. ~~(CPF #1312180112),~~ Bar No. 19760
RIFKIN WEINER LIVINGSTON, LLC
7700 Wisconsin Ave, Suite 320
Bethesda, Maryland 20814
(301) 951-0150 (phone)
(301) 951-0172 (facsimile)
cfax@rwllaw.com
mkatz@rwllaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record via the

Court's CM/ECF system as follows:

Paul D. Burgin, Esq. (Bar No. 20228)
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One South Street, Suite 1800
Baltimore, MD 21202
Tel: (410) 843-3473
Fax: (410) 752-8861
Paul.burgin@ogletreedeakins.com
*Counsel for Defendants*

_____/s/ Madelaine Katz_____
Charles S. Fax, Esq., Bar No. 02490
Madelaine Kramer Katz, Esq., Bar No. 19760
RIFKIN WEINER LIVINGSTON, LLC
7700 Wisconsin Ave, Suite 320
Bethesda, Maryland 20814
(301) 951-0150 (phone)
(301) 951-0172 (facsimile)
cfax@rwllaw.com
mkatz@rwllaw.com
*Counsel for Plaintiff*